Robert W. Clarida
Benjamin Sahl
COWAN, LIEBOWITZ & LATMAN, P.C.
1133 Avenue Of The Americas
New York, NY  10036-6799
(212) 790-9200

Attorneys for Defendant GREGORY MURPHY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

EFFIE FILM LLC,                                    :

              Plaintiff,                        :            11-CV-0783 (TPG)

       -against-                              :            **REPLY MEMORANDUM
                                                                OF LAW IN SUPPORT OF**
GREGORY MURPHY,                          :            **DEFENDANT'S MOTION
                                                                TO DISMISS**
            Defendant.                       :

                                                                   :

---------------------------------------------------------------

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ...............................................................................................................2

1.  Plaintiff's Allegations and Representations Are Inconsistent, Inaccurate, Irrelevant or Simply Not Entitled to be Accorded Consideration............................2

    A.  Plaintiff's Declarations Are Not Entitled to a Presumption of Truthfulness .........................................................................................2

    B.  Plaintiff Based Its Jurisdictional Argument on Allegations Concerning Obstacles to Financing And Distribution Which It Now Abandons...........................................................................................4

    C.  Plaintiff's Factual Representations, Credible or Not, Are of Limited or No Relevance ..........................................................................6

    D.  Plaintiff's Purportedly Factual Representations Are Inaccurate.................9

2.  The Alleged Controversy Lacks Immediacy And Concreteness .........................11

    A.  Plaintiff Alleges That a Controversy Might Arise in 2012, at the Earliest .............................................................................................11

    B.  The Purported Controversy Lacks Concreteness, As the Work With Respect to Which Plaintiff Seeks Declaratory Relief Does Not Exist ..............................................................................................14

3.  Plaintiff Seeks Relief Which No U.S. Court Has the Power to Grant ..................18

CONCLUSION...........................................................................................................19

i

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant:small-caps">Cases</span>

*AARP v. 200 Kelsey Assocs., LLC,*
  06 Civ. 81 2009 U.S. Dist. LEXIS 969,
  (S.D.N.Y. Jan. 8, 2009)...................................................................................12, 15

*Adenta GmbH v. OrthoArm, Inc.*,
  501 F.3d 1364 (Fed. Cir. 2007)...........................................................................17

*Diamonds.net LLC v. IDEX Online, Ltd.*,
  590 F. Supp. 2d 593 (S.D.N.Y. 2008)..................................................................18

*Harriman v. IRS*,
  233 F. Supp. 2d 451 (E.D.N.Y. 2002) ...................................................................2

*Kamen v. Amer. Tel. & Tel. Co.*,
  791 F.2d 1006 (2d Cir. 1986)................................................................................3

*MedImmune, Inc. v. Genetech, Inc.*,
  549 U.S. 118 (2007).......................................................................................14, 17

*Micron Tech., Inc. v. Mosaid Techs., Inc.*,
  518 F.3d 897 (Fed. Cir. 2008)..............................................................................17

*Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*,
  896 F.2d 674 (2d Cir. 1990)...............................................................................3, 9

*Salinger v. Colting,*
  607 F.3d 68 (2d Cir. 2010)...................................................................................10

*Sierra Applied Sciences, Inc. v. Advanced Energy Indus., Inc.*,
  363 F.3d 1361 (Fed. Cir. 2004)...................................................................9, 14, 15

*Shloss v. Sweeney,*
  515 F. Supp. 2d 1068 (N.D. Cal. 2007) .................................................................9

*Sobini Films v. Tri-Star Pictures, Inc.*,
  2001 U.S. Dist. LEXIS 23509, 61 U.S.P.Q.2d 1930 (C. D. Cal. 2001) ........................ passim

*Thos. G. Lang v. Pacific Marine & Supply Co.*,
  895 F.2d 761 (Fed. Cir. 1990)..............................................................................13

*Thomas v. Union Carbide Agric. Prods. Co.*,
  473 U.S. 568 (1985)..............................................................................................15

*Windsurfing Int'l Inc. v. AMF, Inc.*,
  828 F.2d 755 (Fed. Cir. 1987).........................................................................................1

**STATUTES**

Fed. R. Civ. Pro. Rule 12(b)(1).......................................................................................2, 3

Fed. R. Civ. Pro. Rule 12(b)(6)..........................................................................................3

Fed. R. Civ. Pro. 15...........................................................................................................1

29249/000/1229404.4

## PRELIMINARY STATEMENT

Challenged as to the sufficiency of its argument in favor of jurisdiction, Plaintiff responded to the instant dismissal motion with hundreds of pages of new factual material and asked this Court to consider a *new* set of jurisdictional facts based upon new allegations in its declarations.  Plaintiff has, in effect, amended its Complaint without seeking leave of this court under Fed. R. Civ. Pro. 15.  But no amount of papering-over can obscure the simple fact that Plaintiff is not entitled to declaratory relief with respect to a work which does not exist, here a hypothetical film.  The Declaratory Judgment Act ("DJA") does not create jurisdiction where there is not otherwise a concrete, immediate legal controversy.

Since filing its Complaint, Plaintiff has changed its story about its financing in an after-the-fact attempt to create the appearance of a justiciable controversy.  In its Complaint, Plaintiff alleged at paragraph 6 that it needed exigent relief in order to close its financing.  After Defendant pointed out in its opening brief that this fact, if true, would not support subject matter jurisdiction, Plaintiff has reversed course to assert not only that it has all the financing that it needs to complete production, but that much of this financing was in place in 2010 – prior to the filing of the Complaint.  But act quickly, Plaintiff insists, this is a limited time offer.

None of Plaintiff's shifting stories change the fact that Plaintiff's request before the Court in this action boils down to "we would like to use the [work], but before we do, we want a court to say we may do so safely."  *Windsurfing Int'l Inc. v. AMF, Inc.*, 828 F.2d 755, 758 (Fed. Cir. 1987).  Such a request is nonjusticiable.

In its opening brief, Defendant challenged Plaintiff to find a single decision in the history of American jurisprudence granting the relief Plaintiff seeks.  Plaintiff's silence is eloquent. While Plaintiff's Opposition papers elaborate on the convenience the putative filmmakers would

1

enjoy if this Court were to issue declaratory relief, the papers only emphasize that the immediacy and concreteness required for this Court to do so are entirely absent.

Plaintiff fails to meet its burden to establish the existence of jurisdiction.

## ARGUMENT

1.   **Plaintiff's Allegations and Representations Are Inconsistent, Inaccurate, Irrelevant or Simply Not Entitled to be Accorded Consideration**

   A.   Plaintiff's Declarations Are Not Entitled to a Presumption of Truthfulness

As a threshold matter, Plaintiff represents to this Court that jurisdictional allegations made in the declarations submitted in support of its opposition to the instant motion "must be taken as true." Br. in Opp. at 1 (citing no authority). This is not so.

Allegations in a complaint are presumed true when a defendant attacks the pleadings. Even jurisdictional allegations in a complaint are presumed true in a facial jurisdictional challenge. But jurisdictional allegations extrinsic to a complaint are only relevant in a factual jurisdictional challenge, and in such a challenge, *none* of a plaintiff's allegations are entitled to the presumption of truth. "A defendant may move to dismiss pursuant to Rule 12(b)(1) in two separate ways. He can either attack the complaint on its face, arguing that the Plaintiff has failed to allege facts supporting subject matter jurisdiction or he can argue that factually, jurisdiction is lacking." *Harriman v. IRS*, 233 F. Supp. 2d 451, 456 (E.D.N.Y. 2002):

> The material that is reviewable by a court differs depending upon the type of attack being made. On a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(1) based on a facial defect in the complaint, the court should review the complaint, deeming all averments as true, for sufficiency. However, if Defendant has made a factual challenge to the Plaintiff's allegations in the complaint to the effect that jurisdiction is lacking, the Court may consider affidavits and other material beyond the pleadings to resolve the jurisdictional question. Further, *truth of the allegations in the complaint is not presumed* rather, the burden is on the plaintiff to satisfy the Court, as fact-finder, of the jurisdictional facts.

*Id*. at 457 (internal quotations and citations omitted) (emphasis added).

2

In bringing the instant motion, Defendant set out, under 12(b)(6), to attack the pleadings, and, under 12(b)(1), to facially and factually challenge the sufficiency of Plaintiff's jurisdictional allegations.  Plaintiff, which bears the burden of establishing the existence of jurisdiction, has responded in its opposition papers with a jurisdictional argument based upon extrinsic facts alleged in declarations offered in support of its brief in opposition.  *See* Br. in Opp. at 1. Accordingly, Plaintiff's allegations are not entitled to a presumption of truthfulness in the context of the factual 12(b)(1) challenge.[1]  Additionally, to be considered in this 12(b)(1) posture, Plaintiff's proffered evidence must be competent.  *Kamen v. Amer. Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir. 1986).  Because statements made in Plaintiff's declarations are only relevant in evaluating the factual 12(b)(1) challenge, this Court may not consider conclusory or hearsay statements made in Plaintiff's declarations *at all*.  *Id.*  Finally, Plaintiff's numerous statements of belief and intent may, in the judgment of a fact finder, make the likelihood of the occurrence of future conditions *appear* more or less likely, but they can never, without more, establish that future contingent events will actually occur.  Furthermore, as discussed more fully below, statements of belief and intent about the content of a movie which does not yet exist are entitled to no weight whatsoever in a justiciability analysis.  *See infra* at pp. 16-17 (discussing *Sobini Films v. Tri-Star Pictures, Inc.*, 2001 U.S. Dist. LEXIS 23509, 61 U.S.P.Q.2d 1930 (C. D. Cal. 2001)).

---

[1] Plaintiff's allegations are entitled to a presumption of truthfulness in the adjudication of Defendant's 12(b)(6) challenge, but the 12(b)(6) challenge only need be addressed by this Court if Defendant's 12(b)(1) challenge fails.  A challenge to jurisdiction must be adjudicated prior to any 12(b)(6) motion.  *See Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990). Dismissal of an action for lack of jurisdiction renders other motions moot.  *Id.*

B.     Plaintiff Based Its Jurisdictional Argument on Allegations Concerning
Obstacles to Financing And Distribution Which It Now Abandons

In its Complaint, Plaintiff alleged that a justiciable controversy arises here because,

without the Court's intervention:  (a) Plaintiff could not close financing for the hypothetical film;

and (b) Plaintiff perceived a risk to its ability to distribute the film it says it hopes to make.

Compl. at ¶ 6.

> In order to close financing to produce a motion picture based on *Effie,* EFL must
> be able to demonstrate that there is no validity to Mr. Murphy's claim of
> infringement regarding the *Effie* screenplay. In addition, even if the motion
> picture could be produced, Mr. Murphy could disrupt distribution, marketing and
> exhibition of that motion picture.

*Id.*

The story Plaintiff now tells is very different.  Now, Plaintiff responds in its opposition

brief that "EFL has secured financing sufficient to meet *Effie's* planned production budget."  Br.

in Opp. at 1.  Similarly, Defendant pointed out that the Complaint did not allege that the

hypothetical film would be finished and ready for distribution within any time frame ever held

justiciable by the courts. Br. at 9.  Plaintiff responds in its opposition brief by asserting that the

threat presented by Defendant is not actually the future one alleged in its Complaint, arising at

the time of distribution, but a more pressing one, leaving Plaintiff at present "stymied in moving

to production."  Br. in Opp. at 1; *see also id.* at 15 ("if this Court is able to grant a timely

declaratory judgment, *Effie* will be able to begin... production").  Plaintiff has not alleged *how* it

is currently stymied, and in fact Defendant does not have, and will not ever have, any power to

obstruct production.  By changing its story as to the hypothetical film's financing and the

timeline of the perceived threat from Defendant, Plaintiff puts its own credibility into question.

In its opposition brief, Plaintiff now alleges that "EFL has secured financing sufficient to

meet Effie's planned production budget."  Br. in Opp. at p. 1.  What has changed since the filing

4

of the Complaint?  First, Plaintiff now reveals that at the time it represented to this Court that "it will be difficult or impossible for EFL or its assignee to close financing," Compl. at ¶ 40, Plaintiff  had in fact been steadily raising money and already had "about half" of the project financing in place prior to filing the Complaint.  Rosenfeld Decl. at ¶ 19; 32.  Second, Plaintiff's President explains that, in the two weeks since Defendant's opening brief in this dismissal motion,  Plaintiff's financing is suddenly complete: "At the time the complaint was filed, I was concerned that we could not obtain sufficient financing due to Murphy's threats.  However, since that filing, through persuasion and explanation that EFL would be able to prevail in this declaratory judgment action, we have been able to secure the necessary financing to complete production."  Rosenfeld Decl. at ¶ 31.  Mr. Rosenfeld offers this Court no explanation regarding when Plaintiff secured the March 2011 financing, from whom, or how much was at issue, beyond asserting that "[i]n addition to the funds which I raised in 2010, Mr. Roald, [Mr. Rosenfeld's business partner,] earlier in March 2011, obtained a commitment from an additional investor."  *Id.* at ¶ 32.  The sole documentary support offered "confirming this commitment," *id.*, is a document purporting to be a letter to Mr. Rosenfeld from his partner Mr. Roald, its signature block unexecuted, dated March 9, 2011 (the week after Defendant filed this dismissal motion), which is silent about funds raised in March 2011.  *Id.* at Exh. 6.

The unsigned Roald document includes the assertion that "[i]t is important to note that although these funds have been raised, should the film not be able to start pre-production by 1 August 2011, we will have to return ALL funds to investors."[2]  Rosenfeld Declaration, Exh. 6 (emphasis in original).  This assertion is difficult to square with Mr. Rosenfeld's sworn statement

---

[2] While this statement may be intended to suggest that Plaintiff cannot proceed with its purported plans to produce a film based upon the screenplay *Effie*, in fact it only emphasizes that the supposed threat presented by Defendant is no obstacle to Plaintiff proceeding to commence filming, so long as it does so by August of 2011.

5

that "[t]he initial investors require us to commence production within 18 months of July 2010," evidently meaning by December 2011.  Rosenfeld Decl. at ¶ 35.

> C.   Plaintiff's Factual Representations, Credible or Not, Are of Limited or No Relevance

Plaintiff's jurisdictional argument is utterly reliant on representations that Plaintiff:  (a) intends to shoot a film based upon the screenplay *Effie*, Br. in Opp. at 1; (b) intends to shoot the film based exactly upon the screenplay as currently constituted, *id.* at 2; and (c) intends sometime in the distant future to seek distribution and exhibition of the film it hopes to complete. Compl. at ¶ 6.  Obviously such statements prove no more than that this is what Plaintiff believes. Although, as discussed above, these beliefs are not even entitled to a presumption of truth for purposes of this motion, Plaintiff asserts that its own beliefs and intentions can create jurisdiction.  Br. in Opp. at 1.  This is not the law.  *Sobini* addressed just such statements of intent in the directly parallel context of a developing film project and found they ought to be given no weight whatsoever.  *Sobini* at *25; *see* discussion *infra* pp. 16-17.

The inherent unreliability of statements of the belief and intent of even sincere professionals in the film industry is demonstrated by the history of *Effie* itself.  Production of *Effie* has been repeatedly pronounced imminent, going back as far as 2008.  In November 2008, the LONDON EXPRESS, presumably on the authority of someone associated with the project, announced that:  "…Effie, a film [Ms. Thompson] has written based on the sexless marriage of Victorian art critic and writer John Ruskin has, we can reveal, got the go-ahead, and will be filmed in Mallorca in March [2009] …"  Murphy Reply Decl., Exh. 6  In March, 2010, an article about *Effie* in THE OBSERVER (that included an interview with Ms. Thompson's husband, Mr. Wise) declared:  … Wise and Thompson hope to start shooting [*Effie*] next month [April 2010] in Venice and Scotland …" Murphy Reply Decl., Exh. 7.  Even as recently as October, 2010

6

counsel to producers of *Effie* stated that regarding production, the producers were: "very optimistic that it will begin before 31st March 2011." Murphy Reply Decl., Exh. 4. Perhaps a better title for the project would be *Iffy*.

Despite such representations, over that period of time, *Effie* has continued to be rewritten and revised. *See generally* Thompson Decl. Although Plaintiff insists that the script is now "fixed, final," Br. in Opp. at 2, Mr. Rosenfeld does not even warrant that the screenplay will remain the same until filming is completed, asserting no more than that he does "not expect to ask Emma to undertake any significant rewriting during production." Rosenfeld Decl. at ¶ 27.

Similarly irrelevant are the laudatory litanies -- of the achievements of *Effie*'s screenwriter and of the *bona fides* of Plaintiff's President -- with which Plaintiff has larded its voluminous papers in opposition. Given the realities of the motion picture business, the track records of those associated with Plaintiff are no guarantee that a film based upon the screenplay *Effie* will ever be shot, much less distributed. Mr. Rosenfeld in fact has no way of knowing whether, if such a film is ever made, he will be even remotely involved. During the fitful history of *Effie* noted above, the project's key producers were Gail Egan and Andrea Calderwood and the formidable Ealing Films was involved. Rosenfeld Decl. at ¶ 14; Murphy Reply Decl. at ¶ 14. Apparently that is no longer so. *Id.* Given Plaintiff's trumpeting of the resumes of those it claims are now associated with *Effie*, *see* Rosenfeld Decl. at ¶ 36 and the Rosenfeld and Thompson Decls. generally, it seems unlikely Plaintiff would miss the chance to assert that *Effie*'s chances of being produced have *increased* with the departure of the well-respected Ms. Egan, Ms. Calderwood, their production company Potboiler, Ealing Films and La Fabrique 2, if it believed that were the case. *See* Murphy Reply Decl. at ¶ 14.

When Gregory Murphy met with Emma Thompson in her home on December 14, 2009, she told him that due to the fact that her husband Greg Wise had never starred in a major feature film and director Richard Laxton had only directed one feature film with a limited distribution, there was a real possibility that *Effie* would never be made.  Murphy Reply Decl., ¶ 16.  As the actress Carrie Mulligan stated in March of 2010, regarding her association with *Effie*:  "I actually don't know what's happening with that. I read that script about two years ago. That's another difficult independent British film. That's hard to get made. I don't know if that film is going." Murphy Reply Decl., Exh. 8

The courts have recognized the inherent uncertainty of film production: "[I]t is common knowledge in the motion picture industry that most proposed film projects are never actually produced and only half of the screenplays of *even established motion picture writers* are actually produced."  *Sobini*  at *25. n.7 (emphasis added).   Furthermore, even if *Effie* were begun and completed, there is no certainty when, or if, it would find a distributor.  Distribution for any independent film is notoriously difficult to guarantee, in particular for historical dramas.  This was addressed in a recent article in THE NEW YORK TIMES,  which reported the inability of the "studio war horse" Robert Redford to find a distributor for his completed independent historical film *The Conspirator*, featuring established Hollywood performers such as Kevin Kline and Robin Wright.  Murphy Reply Decl. Exh. 9 ("biographies… are sometimes tolerated, but seldom hotly pursued, in contemporary Hollywood").

In sum, the resume materials of those associated with Plaintiff are not relevant to jurisdiction, as prior achievements cannot create sufficient certainty that a film based on the screenplay *Effie* will or will not ever be revised or rewritten, enter production, be completed, or be distributed, or, if any these were to happen, provide any clue as to when.

8

Plaintiff's representations regarding the purportedly "small differences" between the 2009 and 2010 are similarly irrelevant.  Differences, regardless of how "small," render the matter injusticiable.  The works must be "the same."  *Shloss v. Sweeney,* 515 F. Supp. 2d 1068, 1078 (N.D. Cal. 2007).  Under *Shloss* it is irrelevant how "small" the differences might turn out to be between the *Effie* screenplay and a hypothetical film based upon the *Effie* screenplay.  In order for a court to render a declaratory judgment of non-infringement, a plaintiff "'must establish that the product presented to the court is *the same product* which will be produced if a declaration of noninfringement is obtained.'"  *Id.*, *quoting Sierra Applied Sciences, Inc. v. Advanced Energy Indus., Inc.*, 363 F.3d 1361, 1378 (Fed. Cir. 2004) (emphasis added).  Unless and until the hypothetical film were to actually exist, any ruling by the Court as to copyright infringement would be nothing more than an advisory opinion.

Finally, Defendant notes that Plaintiff, with its opposition papers, discusses the Court undertaking a substantial similarity analysis. Br. in Opp. at 11.  This would put cart before horse. Not only is the issue of substantial similarity irrelevant to the instant motion, but a court that lacks jurisdiction may not perform such an analysis.  Dismissal of an action for lack of jurisdiction renders other motions moot.  *See Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990).

Plaintiff's irrelevant factual representations cannot overcome the fact that Plaintiff seeks a declaratory judgment concerning a work that does not exist and a controversy that might arise, if ever, eighteen months from now at the earliest.

### D.   Plaintiff's Purportedly Factual Representations Are Inaccurate

Plaintiff pled to this court that it could not obtain financing.  Compl. at ¶ 6. Indeed, this was the sole imminent, concrete basis on which the original Complaint sought to ground jurisdiction.  Plaintiff now tells this Court that this pleading was not what it appeared to be:

9

"EFL has secured financing sufficient to meet *Effie's* planned production budget..." Br. in Opp. at 1. Undaunted by the fact that its supposedly fatal obstacle has by its own report evaporated, Plaintiff in its Brief in Opposition now represents that it "has been stymied in moving to production by infringement claims asserted by" Defendant, Br. in Opp. at 1, and that "the *Effie* screenplay cannot be translated into film." *Id.* at 2.

These statements cannot be squared with Plaintiff's sworn declarations to the effect that the project "has a final, 'shooting script' screenplay, financing for a full production budget, a committed cast of highly-regarded and award-winning actors, and the participation of the experienced personnel necessary to the production of a motion picture," *id.* at ¶ 4, subject only to the "impediments created by Murphy's assertions of infringement." Br. in Opp. at 10. Defendant, it is alleged, "could simply wait until a sensitive moment in the production and then bring his infringement action." Rosenfeld Decl. at 22. Rosenfeld asserts, *ipse dixit*, that Defendant could thus "delay shooting," *id.*, but neither Rosenfeld nor Plaintiff explain *how*.

Plaintiff's assertion is false. Defendant, even assuming an unlimited budget and an army of lawyers, has no ability to prevent Plaintiff from shooting its movie.[3] Plaintiff's factual representations to the contrary are as empty as Plaintiff's now-abandoned claim in its Complaint that Defendant could prevent it from obtaining financing.

Plaintiff also misrepresents to this Court the nature of Defendant's communications with Plaintiff. Plaintiff asserts that Defendant's July 2009 letter stated "what he believed were the actionable similarities between *Effie* and his screenplay of *The Countess*." Br. in Opp. at 3

---

[3] Moreover, for what it may be worth, Defendant does not intend to delay Plaintiff's production schedule and has never threatened to do so. Moreover, an injunction against a yet-to-be-filmed movie would constitute a prior restraint on speech that a court almost certainly would decline to impose *even if the court were convinced that the movie would likely infringe*. *See, e.g., Salinger v. Colting* 607 F.3d 68 (2d Cir. 2010)That Defendant would not be entitled to relief in that posture should make clear that Plaintiff is not entitled to declaratory relief here.

10

(citing to Thompson Decl., Exh. 8).  This is not accurate.  Defendant in that communication said nothing about "actionable similarities" and went no further than stating that "I believe *Effie* and *The Countess* are distinctly related in character development, structure and tone" and "point[ing] out a few instances."  Thompson Decl., Exh. 8.

Similarly inaccurate is Plaintiff's statement that negotiations between Defendant and Plaintiff's predecessor and broke down because "Murphy made unacceptable demands regarding credit and a monetary payment," Rosenfeld Decl. at ¶ 16, and because "Murphy's demands for both money and screen credit escalated to the breaking point."  Br. in Opp. at 4.  Defendant noted in his affidavit in support of his moving papers that in the course of the negotiations, both credit and money had been agreed upon and that negotiations broke down over the timing of payment.  Murphy Decl. at ¶ 26.  In contrast, Plaintiff's publicly-filed court documents imply that negotiations broke down because Defendant is selfish and greedy and, in filing his first affidavit, a liar.  With that in mind, exhibits 1 through 5 to Murphy's Reply declaration document Defendant's version of events and offer the Court a fuller record on which to evaluate Plaintiff's credibility.

## 2. The Alleged Controversy Lacks Immediacy And Concreteness

### A. Plaintiff Alleges That a Controversy Might Arise in 2012, at the Earliest

Plaintiff effectively concedes that, on the best set of facts it can put forward, a controversy cannot arise until late 2012, more than eighteen months in the future.  The relief that Plaintiff seeks is to be immune to a suit for infringement; such a suit would not be tenable until the film exists.  Plaintiff itself alleges that the film would be completed and prepared for exhibition and distribution at the earliest in August 2012.  Rosenfeld Decl. at ¶ 36.  Plaintiff has cited no authority for the granting of declaratory relief eighteen months in advance of the occurrence of an event, let alone one as rife with contingency as the hope to make an

11

independent film.  In that context, even nine months before the existence of the work is premature.  *See Lang* and *Sobini* (holding, *inter alia,* that nine months is too long).

Plaintiff's argument in favor of immediacy in its Brief in Opposition suggests that the relevant date is August 2011, when it purports to intend to commence production.  "The *Effie* screenplay cannot be translated into film," asserts Plaintiff, Br. in Opp. at 2, because Defendant could "delay shooting."  Rosenfeld Decl. at 22.  But neither Plaintiff nor Rosenfeld explain *how* Defendant might "delay shooting."  Defendant has no legal power to prevent Plaintiff from shooting its movie, particularly in the UK and Italy, where production in intended to take place, any more than Defendant had any power in the financing market to prevent Plaintiff from obtaining financing (in the UK, it appears from Mr. Roald's document. Rosenfeld Dec., Exh. 6).

Plaintiff further attempts to water down the Supreme Court's immediacy requirement, citing *AARP* for a rule that "the fact that additional steps may have to be taken before allegedly-infringing conduct can begin does not bar a declaratory judgment."  Br. in Opp. at 9, citing *AARP*.  Plaintiff points out that in that case, in which it was the trademark holder seeking the judgment, "the defendant had not yet taken an essential step in its plans (finding a licensing partner), but the court still found declaratory judgment jurisdiction."  *Id.*  But the defendant in *AARP* had taken a crucial step Plaintiff here has not:  finalizing the allegedly infringing material.  *AARP v. 200 Kelsey Assocs., LLC,* 06 Civ. 81 2009 U.S. Dist. LEXIS 969 (S.D.N.Y. Jan. 8, 2009).  The *AARP* defendant had not only previously sought to register the disputed mark with the United States Patent and Trademark Office (the "USPTO"), it had sought cancelation of the plaintiff's identical mark, in a matter which remained active before the USPTO.  *AARP* at *3. While Plaintiff here has not yet found licensing or distribution partners for their movie *they also*

*have not yet created the putatively infringing work.*  As discussed above, Plaintiffs here are at least eighteen months behind the putative infringers in *AARP*.

Similarly, Plaintiff argues that its claim is justiciable because it "has the current business ability to make a movie from the *Effie* screenplay."  Br. in Opp. at 9.  But belief in that ability is not sufficient; as discussed above and with respect to the history of *Effie* itself, it is difficult to move projects forward in the film business, and many projects associated with established professionals never get made at all.[4]

In any case Plaintiff is clearly unable to get past the nine month bar presented by *Lang*. *Thos. G. Lang v. Pacific Marine & Supply Co.,* 895 F.2d 761 (Fed. Cir. 1990).  Plaintiff argues to this Court that the nine month bar of *Lang* is specific to the facts of that case.  Br. in Opp. at 14-15.  But a comparison of the facts actually does Plaintiff no favors.  At best, Plaintiff's situation is analogous to that of the boat builders in *Lang* at the time the latter had completed a *complete set of plans* to build their hull, at some indeterminate time *prior to* when they had become engaged in actually building it, had commenced their action, and yet were still found to be too early in the process to be entitled to declaratory relief.  A meaningful analogy to the facts of *Lang* locates Plaintiff's activity even *earlier* in the production cycle than the boat builders in *Lang*.

Plaintiff further attempts to pass off the Supreme Court's immediacy requirement as an invention of Defendant.  Br. in Opp. at 15.  "Were there some sort of ironclad "immediately" or

---

[4] Plaintiff cites a line of cases for a rule that a court "has the power to issue a declaratory judgment where there is a practical likelihood that such contingencies will occur."  Br. in Opp. at p. 15 n. 4.  "It is a practical likelihood (if not a complete certainty)," Plaintiff continues, "that these veteran filmmakers will complete the limited remaining steps needed before shooting of *Effie* commences."  *Id.*  In any case, the insurance decisions cited by Plaintiff in its footnote 4 are inapposite, as the types of contingencies and the "practical likelihood" of their occurring are not analogous to those at issue here.

"nine month" restriction on declaratory judgments, that vital remedy... would never be available to the motion picture industry." *Id.* Plaintiff thus explains with great concision why the remedy it seeks is, in fact, unavailable to the motion picture industry and has never been granted. Immediacy is not an invention of Defendant, but a well-settled requirement of Article III jurisdiction recently reaffirmed by the Supreme Court in *MedImmune. MedImmune, Inc. v. Genetech, Inc.,* 549 U.S. 118 (2007). That is as "iron-clad" as rules get in the federal courts.

Even if August 2011 were a relevant date, as Plaintiff erroneously contends, and the court held the time period to be sufficiently "immediate," the matter would not be justiciable because it lacks required concreteness.

> B.      The Purported Controversy Lacks Concreteness, As the Work With
>          Respect to Which Plaintiff Seeks Declaratory Relief Does Not Exist

Plaintiff argues in its opposition papers that it is "taking meaningful steps" towards creating a potentially infringing work, Br. in Opp. at 8, and asserts that "[a] declaratory judgment plaintiff need show no more." *Id.* at 10. But a plaintiff must indeed show more. Irrespective of the number of steps one takes, a plaintiff must show not only that the controversy is imminent, but must allow the court to reach "certainty" that "the product presented to the court is the same product which will be produced if a declaration of noninfringement is obtained." *Sierra* at 1378-79.

Plaintiff seeks a declaratory judgment that, *inter alia*, a certain motion picture does not infringe the copyrights in a certain play and screenplay. Compl. at p.11. The motion picture does not exist. Plaintiff argues that Plaintiff's screenplay can stand in for the non-existent motion picture, like a Hollywood stunt double. Br. in Opp. at pp.10-12. Although Plaintiff argues the point at length, it cites *not a single case* supporting this proposition. *Id.* Plaintiff's

argument is so far removed from precedent that, tellingly, Plaintiff does not even attempt to offer the Court a supposedly analogous set of factual circumstances in which relief has been granted.

As discussed above, a screenplay may change, a film may be more or less faithful to whatever screenplay with which filming is begun, and a film may never be distributed, or completed, or even begun.  Neither statements of intent, disavowals of contractual rights, nor solemn oaths can provide this Court sufficient "certainty" that "the product presented to the court is the same product which will be produced if a declaration of noninfringement is obtained" such that it could render a declaratory judgment as to infringement regarding a film which is yet, if ever, to be made.  *Sierra* at 1379.  "Claims that involve 'contingent future events that may not occur as anticipated, or indeed may not occur at all,'" are not justiciable.  *AARP* at *10 (quoting *Thomas v. Union Carbide Agric. Prods. Co*., 473 U.S. 568, 580-81 (1985)).

Among the fatal weaknesses of Plaintiff's argument that a screenplay can stand in, in an infringement analysis, for a movie that doesn't exist, is that the argument relies on a number of statements of belief and intent on the part of Mr. Rosenfeld:  that the movie will be made at all; that it will be a word-for-word adaptation of the current version of the screenplay; that if one could make a non-infringing adaptation of the current version of the screenplay, all possible adaptations of the current version of the screenplay would be non-infringing.  Plaintiff's argument thus is utterly reliant on beliefs and intentions concerning the content of a yet-to-be-made motion picture, and this is a type of representation that the *Sobini* court considered and accorded *no weight whatsoever*.

Plaintiff goes to some lengths to try to distinguish itself from *Sobini* on the facts.[5]  In particular, Plaintiff argues that its case for jurisdiction is superior to that of the plaintiff in *Sobini* because the latter concerned a film project that had not advanced beyond a written treatment, whereas Plaintiff has a full screenplay.  Br. in Opp. at 16-17.  A treatment is an even more skeletal precursor of a motion picture than a screenplay.  *See* Rosenfeld Decl. at ¶ 28.  Therefore it would appear even more difficult to engage in the close and delicate analysis required to evaluate whether substantial similarity exists and thus even more difficult to, as Plaintiff here puts it in discussing *Sobini*, "determine that a film made from the treatment would not infringe defendant's claimed copyright in Zorro."  Br. in Opp. at 16.  But *Sobini* did not simply concern a copyright.  It concerned a trademark.  In seeking declaratory relief with respect to the defendant's trademark, the plaintiff in *Sobini* was not asking the court to engage in a nuanced reading of one artistic work against another; the plaintiff simply represented that it planned to make a Zorro movie and sought declaratory judgment to the effect that, *inter alia,*

> "Zorro" is a generic name for any incarnation of the Zorro character... and thus is not protectable as a trademark on products that primarily feature or are essentially a way of packaging the Zorro character... [and] the pictorial or visual depiction of Zorro dressed in black, wearing a flat Cordoba hat, a mask and cape, and brandishing a sword sometimes while astride a horse, is a generic depiction of the Zorro character, not a depiction uniquely identified with Defendants, and is thus not a protectable trademark or trade dress on products that primarily feature or are essentially a way of packaging the Zorro character"

2001 U.S. Dist. LEXIS 23509 at *2.  One would think there was no appreciable practical likelihood that the Zorro described in the treatment would not appear in the motion picture:  after all, plaintiff wanted to make *a Zorro movie* (entitled "Zorro 2040").  *Id.* at *3.  Consequently,

---

[5] Not that the *Sobini* facts favor Plaintiff, which here does not allege it has spent its first dollar on a film based on the screenplay *Effie.*  The *Sobini* plaintiff had already invested over $100,000 in the project at the time that matter was before a court. *Sobini.* at *21.  That is at least as "meaningful" as any step Plaintiff has taken here.

one might assume there would be precious little wiggle room to make such a film without infringing the defendants' trademark:

> Plaintiff asserts that Defendants have improperly claimed exclusive ownership of the "Zorro" character in the past, have asserted this claim in court, and have obstructed Plaintiff's exploitation of its Zorro Treatment. See Cpt. P 4. Specifically, Defendants have asserted that they exclusively hold all rights to exploit any versions of the Zorro character in any medium, and that they are thus entitled to enjoin others from exploiting Zorro. Among other claims, Defendants contend to have exclusive trademark rights to use the name Zorro and the image of Zorro as a man dressed in black, wearing a flat Cordoba hat, a mask and cape, and wielding a sword in all entertainment media in which any version of Zorro is featured.

*Id.* at *5. Despite the specificity of the filmmaker's intention to use the Zorro elements in his film, the *Sobini* court found the matter injusticiable because, given the uncertainties inherent in the industry, a statement of belief and intent *cannot stand in for a conflict which does not yet exist*. "Despite plaintiff's insistence that the finished product will contain the 'traditional' Zorro elements, it is also possible that the final product will not infringe on any trademark." *Id.* at *25. The representations of the beliefs and intent of Plaintiff here, and those associated with it, are no more cognizable than the "plaintiff's insistence" in *Sobini*, and thus cannot be taken to create sufficient certainty that a film made from the screenplay *Effie* will or will not infringe on another work, or even to mean that such a film will ever be made at all. The soundness of *Sobini*'s view, and thus the lack of concreteness here, is no better demonstrated than by the troubled history of *Effie* itself discussed above and the shifting representations made by Plaintiff in this matter.

Plaintiff seeks to convince this Court that the fact that Defendant communicated with Plaintiff's predecessor is strong evidence of an actual controversy. "Even after *MedImmune*, threats of infringement suits like those Murphy has made are strong evidence that an actual and adversarial  controversy exists between the parties." Br. in Opp. at 13. While post-*MedImmune* decisions have allowed that the apprehension of litigation, while no longer a requirement for

justiciability, can still be considered in determining whether a actual controversy exists, Defendant is aware of no authority for the proposition that threats alone, can overcome a lack of concreteness and immediacy, and Plaintiff cites none.  Certainly the cases Plaintiff cites do not state such a rule.  In the first two of the three patent dispute decisions plaintiff cites in support of this proposition, the putative infringer was already manufacturing and selling the product at issue, *Micron Tech., Inc. v. Mosaid Techs., Inc.,* 518 F.3d 897 (Fed. Cir. 2008); and *Adenta GmbH v. OrthoArm, Inc.*, 501 F.3d 1364 (Fed. Cir. 2007). In the third, an upgrade to an existing website, which was in present existence but which did not yet infringe only because it had not yet been "launched," was deemed sufficient to create jurisdiction.  *Diamonds.net LLC v. IDEX Online, Ltd.*, 590 F. Supp. 2d 593, 598-99 (S.D.N.Y. 2008).  No similarly concrete and immediate dispute is present here.

### 3.    Plaintiff Seeks Relief Which No U.S. Court Has the Power to Grant

In its opposition, Plaintiff purports to misunderstand Defendant's point that with respect to a film to be distributed internationally, a U.S. declaratory judgment "would... leave plaintiffs in exactly the position they now claim to occupy, *i.e.*, unable to close financing for the hypothetical film."  Pls. Moving Br. at 16.  If Plaintiff's need for relief is such that, as it now asserts in opposition, it cannot proceed with its film project unless a court eliminates the risk that Defendant could somehow "stymie" production or "delay filming" by commencing an infringement action, Plaintiff cannot get relief from a U.S. court.  Nothing a U.S. court can do would prevent Defendant from commencing an action in any other territory in which the film were to be distributed.  Indeed, Plaintiff itself intends to film the hypothetical movie in the UK and Italy, see Rosenfeld Decl. at ¶ 36, so it is difficult to imagine how any judgment from this Court could in any way affect Defendant's ability to "delay filming," even if Defendant had any

18

intention of doing so.  The risk Plaintiff perceives would thus continue to exist, even were

subject matter jurisdiction to exist and a U.S. court were to issue a judgment in Plaintiff's favor.

## <u>CONCLUSION</u>

Plaintiff, which concedes that it is Plaintiff's burden to establish the existence of

jurisdiction, Br. in Opp. at 5, has failed to carry that burden.  This motion to dismiss should

accordingly be granted.

Dated:  New York, New York
        March 22, 2011

COWAN LIEBOWITZ & LATMAN, P.C.


By:
     */s/ Robert W. Clarida*
     Robert W. Clarida
     Benjamin Sahl

     1133 Avenue of the Americas
     New York, New York  10036
     (212) 790-9200

     Attorneys for Defendant
     GREGORY MURPHY